Attorneys who are going to argue, step up and introduce yourselves to us, please. Good afternoon, Your Honors. Kathryn Weiler for ArcelorMittal. Can you pronounce it again? Sure. Weiler, W-E-I-L-E-R. Not your name, but your client's name. Arcelor or ArcelorMittal. ArcelorMittal. Yes. Okay. Good afternoon, Your Honors. Kenneth Alrysock on behalf of the Appley's Gallo Equipment Company and Travelers Insurance. And I also have one colleague, Joseph Frini, with me as well. Okay. You are both entitled to 20 minutes aside. You do not need to take the full 20 minutes. But I will ask you as the appellant if you'd like to reserve some of that time for rebuttal. We would, Your Honor. Five minutes. Okay. And then I'll just remind you to keep your voices up. That does not amplify. That's simply recorded. Five minutes. All right. We're ready whenever you are ready. You may begin. Thank you, Your Honor. May it please the Court, my name is Kathryn Weiler and I represent the defendant appellant ArcelorMittal in this appeal. Today we ask that the circuit court's order granting summary judgment be reversed for two reasons. First, Travelers is not entitled to recover under the Equipment Supply Agreement between Arcelor and Gallo. Under the Equipment Supply Agreement, Gallo agreed to waive its rights to segregate claims such as the one at issue here. Based on the plain language of that contract, Travelers' claims are precluded. It has no right to receive segregation here. And Gallo breached its contract by failing to obtain a segregation waiver. The circuit court's summary judgment for Travelers and dismissal of Arcelor's related breach of contract against Gallo should both be reversed. And the case will be amended for further proceedings on those claims. Second, and as a separate matter, the circuit court erroneously awarded Travelers $305,000 approximately in damages. That ruling is also erroneous as a matter of law. There exist clearly disputed issues of fact about valuation, about the proper way to calculate damages in this case, and only a finder of fact could resolve those disputes. Instead, the circuit court in this case simply determined arbitrarily the amount of damages to be awarded here on a motion for summary judgment. That itself should be reversed. First, the Equipment Supply Agreement. That agreement, read as a whole, shows that the parties to the agreement, ArcelorMittal and Gallo, agreed that Gallo could not assign any claims under the contract, including segregation claims. The plain language of the contract lays out that agreement. You're talking about Section 11, I assume. Are you talking about any other sections? I am, Your Honor, because the entire contract needs to be reviewed as a whole to ascertain the intent of the parties. Section 10 includes that specific language related to whether or not there can be any assignment under the contract. And, Justice Smith, I'm happy to read it to you. I've got it right here. Very good. That is the preliminary point of the analysis that the Court should consider, because, again, it's not just paragraph 11, Section 11 of the contract that needs to be reviewed. I don't understand the applicability of Section 10 to the segregation of its right to recover, which is really what you're complaining about. What are you saying Gallo did wrong under Section 10? Just tell me which part of Section 10 you're relying on. If I may, and I will answer the question directly, but if I may, I have to take a half a step back. The reason I think it's important to look at the language of Section 10 is to understand the fundamental intent of Section 11. And the Court is absolutely correct that Section 11 is the core of this dispute, and whether or not there is a violation of Section 11, that is the language that this Court is clearly focused on and rightly so. The reason I think the Court looks to Section 10 first is not because of a dispute about whether there's been a violation of Section 10. It's because Section 10 speaks directly to the following paragraph, to Section 11. What exactly was the intent of the parties under this agreement? And Section 10 highlights that, that there should be no assignment under this agreement. When we discuss whether or not there can be segregation here, that's the point of the no-segregation provision. It is essentially no assignment. Did you state the Section 10 in your brief? We did, Your Honor. It's in our Statement of Facts where we discuss specifically that under the language of the contract there can be no assignment. And it is that lack of an ability to make an assignment that speaks directly to Section 11. We're not filing. Okay. An assignment is not the same as segregation. That's correct, Judge. And, Your Honor, and that's why the next paragraph, again, which the Court is rightly focused on, Section 11. Okay. Well, let's focus for a second on Section 11. Which policy listed in Section 11 do you even say this claim should have been brought under by GALA? The Commercial General Reliability Insurance Company. And how would that even cover this claim? Because in this situation, GALA is alleging that ArcelorMittal is the responsible party for that damage. Therefore, if... As an additional insured under GALA's contract CGL policy... That's correct. That's where you say that claim should have been brought. That's correct. That's correct, Your Honor. On your behalf as an additional insured. That's correct, Your Honor. Okay. Although a coverage you could have invoked as well as an additional insured. If we had been named as an additional insured. Was that the claim, that they didn't name you as an additional insured? I don't see that anywhere in your brief. The problem, Your Honor, if I may, and that relates to the breach of contract claim that ArcelorMittal brought against GALA. That's part of that breach of contract claim, which fundamentally is the failure to include a waiver of segregation. Okay. Is it also a failure to name you as an additional insured? I believe that is discussed in the complaint. I would have to look at the complaint. I do not see that anyway as a defense to this claim by travelers. And, Your Honor, the reason the CGL language becomes important is not only the failure to add ArcelorMittal as an insured under that policy, but also under the specific facts of this case, GALA is alleging negligence by ArcelorMittal. GALA is alleging that there was essentially a third party that caused damage to GALA's property. Right. And that's the basis of its claim. Right. And that would certainly satisfy the requirements to bring a claim under a Commercial General Reliability Policy. Only on your behalf. It's your liability, not theirs. It's your liability that could trigger a CGL policy. I can see that. I don't see how GALA triggers a CGL policy on its own behalf. And that relates back to ArcelorMittal's discussion about negligence. Now, I don't intend to mislead the Court on this because questions of negligence are not at issue on this appeal. However, that's why the record and the original complaints in this case, both brought by Travers and later by ArcelorMittal against GALA, include that discussion about negligence. Which party was the negligent party related to the damages that are at issue here? It seems to me, though, that the real issue here is that whenever the truck, was in the possession of Arcelor, that they were responsible for all risk of loss and damages. And that's the basis of GALA's claim. The basis of GALA's claim is, I believe, twofold. One is, ArcelorMittal, you shouldn't have been responsible for the damages under the contract. That's the first piece of it. That is certainly correct. But the second piece of it is GALA's assertion that ArcelorMittal failed to adjust under its self-insurance policy the damages that GALA was claiming ArcelorMittal caused to the truck. And there is language, certainly, in paragraph 11, in section 11, that says that ArcelorMittal's policy, ArcelorMittal is self-insured. And under ArcelorMittal's self-insurance policy, GALA would be submitting a claim to Arcelor to adjust as if it were an insurance company. That's correct. The problem, though, is that was never resolved. There was ostensibly the submission of the claim. It was not handled formally. There wasn't like a formal tender of a claim by GALA. There wasn't any assignment by ArcelorMittal to an adjuster or to any sort of a formal insurance adjustment process. But there were negotiations. There was an attempt to resolve that claim. And that's what Don Wilhelm talks about. He was ArcelorMittal's point of contact for Mr. GALA on these negotiations. There was an attempt to resolve that claim and to resolve an issue that the parties at that point understood was being raised. There's a claim that ArcelorMittal caused the damages to this truck, that ArcelorMittal should be responsible for it. And under the contract, ArcelorMittal should adjust it. As they're negotiating that, GALA doesn't finish those negotiations. GALA breaks them off and goes and tenders to its own insurance company. After several years. It wasn't several years, Your Honor. It was several months of discussions. But was there anything that obligated them under the contract to continue those negotiations? No. And there wasn't anything under the contract that expressly obligates ArcelorMittal to pay on that claim? Well, I think that arguably there is. I'm sorry, Your Honor. I mean, isn't that what Justice Walker just asked you about? I mean, you're not really making an argument, and I'm not saying you forfeited or waived it, but there's no argument in this briefing that you, ArcelorMittal, didn't ultimately have responsibility for this piece of equipment. I agree with that statement, Your Honor. We're not making that argument. And that, based on the language here, the process that the parties were engaged in was working toward that resolution. And if GALA felt that there was no appropriate action taken by ArcelorMittal and that that breached their contract, there is an obvious way to raise that claim. GALA can bring a breach of contract claim against ArcelorMittal. Or it can go to its own insurer and say, pay us for this tractor. That's true, but within the language of Paragraph 11. Let's go back to Paragraph 11. There's nothing in Paragraph 11 that says you can't get other insurance other than these five policies that are listed here. That goes back to my initial point, which is what is the intent of the parties, and how do we see the intent of the parties? There's no ambiguity before we would even get to that. I mean, if it's clear, there's clear language that says these five policies, you have to buy them. And when you buy them, you have to waive any right to segregation. No language that even suggests these are the only five policies you can buy. And there's lots of other policies that might occur to people to buy.  I'm asking you, where is the language that even could possibly be read as limiting GALA to these five policies? The language that I would direct the court to is Section 11A, Paragraph 2, which is what discusses commercial general liability insurance coverage. Three. I'm sorry, three. Forgive me. And it discusses commercial general liability insurance coverage in a specific amount on all operations for bottling injury and property damage liability arising out of said operations. That's what we are talking about here. We are talking about operations. Property damage liability arising out of operations. And that is the language the parties specifically agreed to. That is the language that GALA elected to ignore by asking, or we don't know how the process went when travelers elected to adjust under the Inland Marine policy. But that is the language that was ignored as a result of adjusting the claim under the Inland Marine policy. You don't say that they didn't buy that insurance. There's no argument that they didn't buy that insurance. The argument is you bought other insurance that's not listed here. That's true. And there's no prohibition of buying other insurance. Absolutely not. The problem is, what was the purpose of this language? I want to say this not to provoke you, but to sort of let you distinguish it. But you're sort of reminding us of arguments we hear a lot. I know it doesn't say that, but the real intent of the legislature, I mean, we don't get to the real intent of anybody if we have clear language that says something. And that's why the clear language of that provision about property damage arising out of operations is important. Then what does 11G mean? 11G says that if equipment is operated by your client and it is damaged, your client has a responsibility to repair or replace it. And it has the opportunity, if it so chooses, to submit its claim under its self-insured policy. Agreed. Right? Yes. So what does that mean in relation to 1A and B, 11A and B? It relates back to the provision that Justice McFarland and I were discussing, which is 11A. The end of 11A includes this language, and it's not in a number of paragraphs, that ArcelorMittal reserves the right to self-insure as set forth in subsection 11G. And that's what is being described in subsection 11G is ArcelorMittal, the process by which ArcelorMittal can self-insure. It's laid out right there. It can and it's responsible for damage to bare equipment. That's right. It's admitted that it was bare equipment, and it was bare equipment because it was being operated by your client. That's right. Right? Yes, Your Honor. So that means your client is responsible for the repair or replacement of that equipment. Right? That doesn't mean that when that happens, your client is responsible for repairing and replacing, but the supplier has to go to his own insurance company to get compensation and waive a segregation claim. That doesn't make any sense. That is what the parties attempted to do here, as I understand it, and I apologize if I'm not addressing the Court's question. I'm trying to do that, is submit the damage to the bare equipment under Arcelor's insurance policy, which happened. Or self-insured. Arcelor is the self-insured. So GALA was submitting the policy to Arcelor as self-insured here, submitted to our policy, and that was done here. And Arcelor attempted to negotiate the appropriate damages that should be paid out on that claim. But before that process was finished, GALA elected to submit it to its own insurer. So take that last step. Let's say Arcelor just said pound sand. We're not negotiating. What do you say this contract then required GALA to do? File a breach of contract claim. And they couldn't go to their own insurer? They could go to their own insurer separately. I'm not sure precisely what that would look like. They couldn't protect themselves any way but 10 years of litigation against you and a breach of contract claim. Well, if they had obtained a segregation waiver, what GALA could have done is go to its insurer, and that would have been the end of the discussion. And then you would have been off the hook for the damages that you agreed you had caused and incurred, and that you were responsible for. Both of the parties in that situation would have been protected. Arcelor would have been protected again. You really say in that situation we would have completely breached the contract so you sue us. To be clear, Judge, I'm not saying that GALA would have succeeded in a breach of contract claim. The court's question was what could GALA have done in answer to that. Let's assume, just hypothetically, you're completely responsible for this equipment. It's completely your liability, yours only. Right? Let's just assume that. Based on the court's question. And let's assume you said pound sand. You're saying all they can do is sue you for breach of contract. There are no insurance rights. No, no, no, Your Honor. They could go to their insurer, but under the language of the contract, they had been required to obtain a segregation waiver. So they would go after the CGL policy against you as an additional insurer to sue you. If they were suing us for breach of contract, they could do that. They could also go to their insurance company and ask their insurance company to adjust the claim based on their insurance policy. But they didn't either. Let me clarify that statement a bit. They could go to their insurance company and ask their insurance company to adjust the claim. It's not your liability. It's your liability. Agreed. I agree with the court on that. But that's the process that the contract anticipated, that they would sue you. Because that's the only way their insurance company is going to get involved. Except if GALA had properly obtained a segregation waiver. Then you would have been off the hook with no monies out of your pocket. That's true. Either through your insurance program or any other way. So that your supplier would have had to go to his insurance company, receive reimbursement for his damages or compensation for his damages, and then incur higher premiums in the future because of the claim filed as a result of your negligence and responsibility. That makes really no sense. And if equity is to apply in this case, it doesn't seem equitable to force them to do that. It doesn't seem equitable, Judge, to include a provision requiring the waiver of segregation and then to in no way, shape, or form give effect to that requirement. That is the fundamental problem here. But in addition to that, and I want to address both of the issues that we raised. If the Court has further questions on my report, I'm happy to address them before I move on to damages. David? We'll give you a little additional time because we used a lot of your time. Do you have another question? Yeah, I do because I just want to make it clear. The agreement, which is an agreement written by ourselves, does not preclude the filing of an insurance claim with travelers. Is that correct? That's correct. That's the only question that I have. That's correct. Absolutely. Turning to the question of damages, Your Honors, that is the second piece of the Circuit Court's erroneous ruling. They are obviously separate issues. If the Court were to reverse based on liability, there would be no need to address this question about damages. But what the Circuit Court did here was simply award travelers $305,000 in change in damages without allowing any evaluation of the facts of what exactly the valuation, the proper valuation of this case should be. What evidence did you submit to the trial court as to the value of this machine? It's in Mr. Gallo's testimony itself. It's in his deposition. Mr. Gallo and Mr. Fink, who is Gallo's comptroller, they both testified. What evidence did your client submit contesting those valuations? At that point in the litigation, Your Honor. No, no. Yeah, at that point. Exactly. At that point in the litigation, Your Honor, ArcelorMittal had filed a motion for summary judgment. We understand that. What evidence did your client submit as to a contestation of the value of the damages to that machine? Arcelor advised the Circuit Court that there was a significant factual dispute about damages. How did they do that? They did that in their response to. . . In a footnote. That's correct, Your Honor. They did not submit any affidavits or other evidence, did they? They did not with their response, Your Honor. That's correct. Was that sufficient? It's sufficient in this case because of two things. One is the procedural posture of the case. Again, where ArcelorMittal had asked the court for summary judgment and was not addressing issues related to damages and specifically asked the Circuit Court for the opportunity to do so. And second, through sworn testimony, which was presented to the Circuit Court in Mr. Gallo's deposition and in Mr. Fink's deposition, excuse me, and the testimony in those two depositions does demonstrate exactly what this dispute over the value of the foregrift and the proper way to evaluate the valuation, that's the core dispute here. Are you talking about the settlement negotiations or are you talking about something else? If the court defines them as settlement negotiations, but that itself is a question. Mr. Gallo talked about the claim was submitted to ArcelorMittal. Through ArcelorMittal's, and again, as I mentioned before, this was not done on a formal we're tendering a claim to you basis, but there absolutely was discussion by which Mr. Gallo advised Mr. Wilhelm, there's damage to the foregrift, we expect ArcelorMittal to pay the damage, we want $285,000, that's the fair market value of the foregrift. That doesn't seem to be a settlement negotiation, it seems to be a negotiation related to exactly how the issue related to insurance and payment is going to be resolved in this case. After those discussions began, Gallo eventually acknowledged that it would accept $235,000, that makes sense in terms of Gallo's valuation. If the valuation of the fair market value of the equipment was $285,000, and as we mentioned in our papers, there's a $50,000 piece of that equipment that is repurposed, it does make sense that $235,000 would be Gallo's valuation of the equipment. But based on the research conducted by Mr. Wilhelm, the proper valuation of an almost 25-year, I believe at that time, tractor would be significantly less, in the $75,000 to $175,000 range. What's your legal basis or basis of the contract for saying that the valuation should be based on fair market value as opposed to replacement value or repair? The contract doesn't speak to how to properly evaluate the piece of equipment. It kind of does. At 6B, it talks about repair and replace. And in 7, it talks about fair market for replacement value. I don't see any place that talks about fair market value with depreciation as being the optimal. But I'm just wondering where you get fair market value from, since you're suggesting that... I'm sorry, I thought the call was... No, I'm done. I'm just wondering if there's anywhere in that contract that says fair market value. The point, Judge, is, Your Honor, is that that's a question that needs to be addressed and resolved. That's the problem. The parties have presented their arguments about what exactly the proper valuation of that equipment would be. And this goes back to the Supreme Court's charge in Court Marine, where reasonable people... I realize you're probably struggling a little bit, but I see in Section 7, they do mention fair market value. For replacement fair market value. And it also says that we'll pay the supplier within fair market value, leading from page 5 to 6 of the agreement. For replacement value. I would be happy to respond to it. It says, keep going on to the top of 7. Market for replacement value. Fair market for replacement value. For replacement value. Something I've never heard of, but it sounds like something more... Your client wrote the contract. But this speaks exactly to Ursula's point on appeal. Because these reasonable minds disagree about the way this contract should be interpreted. That is exactly Ursula Amado's point here. This demonstrates exactly that point. There needs to be a finding by the finder of fact. Now, the finder of fact here is the Circuit Court, Your Honor. Yes, it's true that Oslo Middle is responsible for this contract. But to the extent that there is a question about how that contract should be interpreted as a matter of law, meaning how do we, I'm sorry, as a finding of fact, how do we find the proper valuation of this equipment based on the language of this contract, that needs to be decided by the fact finder here, the Circuit Court. And that did not happen here. This case should be returned to the Circuit Court for an evaluation of those facts, a determination of exactly what is the basis of the Circuit Court's finding, and a determination of damages. Unless the Court has further questions right now, I will reserve the rest of my time. Good afternoon. Again, I am Ken Wysocki on behalf of the Appalachian Gathering Travelers. It's an interesting situation to be in when almost everything on my outline, I think, has already been brought up by the Justices. So let me jump around a little bit while it's fresh on my mind to address the damages issue. Nowhere in that ESA in the appendix is fair market value ever mentioned. If you look at what the actual measure of damage is that's allowed by the contract, it's in there in two different places. It's in there in Section 6 and Section 7. And while the language is a little different, both times it says replacement value or repair value. There is nothing anywhere in that contract that says cash value, actual cash value, ACV value. It's only one of two options, and we chose the lower of those two options. I'd also like to point out with respect to that. Well, it does refer to fair market for replacement value. Right, but respectfully, Your Honor, that term replacement value means replacement, not ACV, actual cash value. But fair market for replacement value. So fair market has to have some meaning. Well, I think it does. If you went out into the market, what you would have to pay to replace it. But I would point out that this distinction that we're talking about was never raised by the appellant in the trial court. They had this one single issue in what I call the wrong footnote. But they never, ever addressed whether cost repair was the correct or incorrect measure of damages, which clearly is in the contract. And the discussion we're having here today about that was never raised by them in the trial court. They can't raise that for the first time on appeal. They never, ever addressed it in any of the trial court pleadings. It was only they were addressed in the appellate court briefings. They never addressed whether or not cost repair was the appropriate measure of damages. And I think based on the plain language of the contract in sections 6 and 7, it is. And I think we could have gotten more. So I think if you look at the testimony of Mr. Gallo, he testified $350,000. Then he testified replacement could have been as much as $600,000. What we did when we were filing the semi-judgment motion was said, what is the amount that we can absolutely justify, that we have the record on that we can absolutely justify this amount? So we had a repair quote. And we had testimony on the repair quote. And we had independent testimony from Mike Gallo that that is what it would have cost to repair that. He's one of the foremost experts. And I guess most importantly, there was no evidence on the other side. That's absolutely correct. And whether you want to call it waiver or they didn't submit evidence, it doesn't really matter. But it's very clear to me that respectfully, that loan footnote is not enough to contest the actual sworn testimony that we introduced on that point. There are a couple of other things I want to address with respect to the contract as a whole. I know there's some references in the brief to the fact that it was negotiated. It wasn't a negotiated contract. And we can tell that by looking at the fact that this appendix that we're talking about, the general terms and conditions, it has Section 11 in it. It's general terms and conditions. There's testimony that it's something that ARSA uses over and over again. The only negotiation was on price. So if you look at what the trial court did, the trial court did not focus just on Section 11, Section G. The trial court ran down the sections that the justices referred to earlier, which is Section 4, Section 6, and Section 7. And if you're looking at a contract to try to determine who bears the risk of loss for damage to a certain type of piece of equipment, a good place to start is the section that says risk of loss, and that's Section 4. And it's so obvious that they're responsible that that finding by the trial court really hasn't been contested on appeal here. So very clearly when you look at 4, 6, and 7 together, ARSA is responsible. Section 4 is the main liability section. Section 6 affects it a little bit, and there's also damages in Section 6 and Section 7. I'm not sure this matters to anything at this point, but could you have submitted a claim under your CTL policy? I don't believe so, Your Honor. This was not a liability type of claim. And there's an implication in the briefs that somehow there was some sort of scheme here to avoid the several waiver by submitting it under an inland marine policy, and that's absolutely incorrect. First of all, this is what I would call an equipment type claim or an inland marine claim, so it was submitted under the correct policy. There's nothing in the contract prohibiting them from doing that. But furthermore, if you look at their brief on page 9 of their opening brief, I'm not sure why they cited this, but they mentioned the fact that Kurt Finke and Mike Garrow never mentioned this segregation waiver to travelers when the claim was being adjusted. And in fact, when Mr. Finke and Mr. Garrow were opposed, they didn't really even know what this meant or understood it, so there's no way that they could have tried to, you know, raise it. They're not that smart. No, they're not that smart. Exactly, Your Honor. This was a claim that was supposed to be. This is a claim that was properly submitted under the correct policy, and there's absolutely nothing in the contract that prohibited my client from doing that. This is a case where Garrow did everything correctly, and if they had not submitted this claim to travelers, it's 2019. It's seven years out of this accident. They probably still wouldn't have their money. But didn't the agreement require that ARSOLA be listed as an additional insurer on the policy? Well, Your Honor, that language involves the CGL policies, which our argument is they're not really even at issue here today. But furthermore, if you look at the record, ARSOLA never really introduced any evidence of what was contained in the CGL policies, and that's their fault to not establish that record at the trial court. If that was something that they were relying on, they had to go ahead and establish that. When Mr. Garrow and Mr. Finke were examined on this at their deposition, their statement was basically, well, I don't know if you were included. We have someone in the office that does that, and if ARSOLA told us we needed to do that, we would have done it. And ARSOLA never follows up on that. And the reason they never follow up on it is because this whole issue about suing Garrow directly in the settlement waiver, that was all something they were trying to use as settlement leverage in this case, and it came back as a settlement leverage. This was never a realistic defense. When the parties were negotiating or attempting to negotiate on the cost of this piece of equipment that was damaged, nobody ever brought up a CGL policy. Nobody ever brought up Section 11A or B. Here's what actually happened. Mr. Garrow was trying to renegotiate this contract with ARSOLA, and they were playing hardball, which is absolutely their right to do. So Mr. Garrow, as part of those negotiations, says, hey, look, I think this machine is worth $300, $350, but I'll take $235 because I want you guys to continue doing business with me. And it was almost offensive to me in the briefs to see ARSOLA use that. First of all, it's arguably inadmissible because it's settlement negotiations, but to use that to try to claim that Mr. Garrow was valuing this at $235 is absolutely wrong. So what Garrow did was they submitted the claim in writing, they had personal meetings, they had telephone calls, multiple times they brought this up, and still at the end of the day, they got no payment from the tractor, the tractor was damaged, and they lost the contract. ARSOLA didn't do anything it was supposed to do under their own contract, and that should be held against them. Your Honors, if you have any more questions, I'm happy to take them. Otherwise, I'm going to wrap it up. Wasn't it correct, too, that travelers found the actual cash value to be between $170,000 and $180,000? Well, Your Honor, that was sort of the first thing in the file about a week or two after the claim was presented, and ultimately the policy required that it be paid on repair value. So that was never used as an actual valuation after the initial first week or two of the claim. And as we discussed earlier So if you can get a new tractor for $180,000, you believe that they should pay $300,000 because of what it costs to repair the old tractor? Well, I don't think they could have gotten a new tractor for that amount, but it goes back to earlier. But how do you pay $113,000 initially? I realize it was several years old, but it wasn't 10 years old. Here's the best way I would look at that valuation. In the demonstration, they talk about fine wine, but here's how I would look at it. If you had to find a Mustang in a barn, and you pay $10,000 for a Mustang. For a car, of course. Either. Let's say it's a car. So you find a really nice Mustang in a barn. You pay $10,000. You put $15,000 into it. If you try to sell it 20 years later, it's not necessarily worth $25,000. It could be more, it could be less. And Mr. Gallagher, who has a lot of experience with these tractors, testified that that's what happens with these things. They can appreciate. So that value that was assigned to travelers earlier on the case, again, it doesn't have anything to do with the contract. And nowhere in the contract does it say they're entitled to ACV or actual cash value. There's two options, repair or replace, and we selected the less expensive of those two options. Thank you, rounders. Just a few points I'd like to follow up on. The first is this idea of never following up about whether or not Arcelor had been added as an additional insured. It's in the contract. Why would Arcelor follow up on that? It should be expected that it would be done. But the more important point I want to speak to is one, Justice Walker, you were just discussing about. I'm sorry. Is there anything in the record that shows that it wasn't done? That they were not added as an additional insured? There's nothing in this record about that. I think the record is ambiguous, and I don't think it's determined one way or another from the record, Your Honor. But the second point that I wanted to raise is this idea about the valuation. And I had been writing down right before you asked it, Your Honor, Travers valued this piece of equipment at between $175,000 to $180,000 when it first received the claim. This isn't a collector's item. This isn't the Ferrari in Ferris Bueller's Day Off. It's a piece of heavy equipment that's being used every single day. It was manufactured in 1993. Its value is not increasing over time. And you see that. Something must have happened to cause them to pay $308,000. I don't. I'm fairly certain that insurance companies don't throw money around like feathers, you know. It's thrown around like sewer covers. They didn't come out with this $308,000 based on a $175,000 initial estimate. I do not know how Travers came up with that final valuation. So is it fair to assume that they were reasonable in their payment? I don't have an answer to that, Your Honor. I simply do not know. What I do know is that Travers' initial value is exactly what we were discussing, what ArcelorMittal is suggesting, somewhere in the $175,000 range. And that's where I'd like to leave the Court with. The language of the Indiana Court of Appeals, as we discuss in our briefs, Indiana law applies here. And I don't normally trouble the Court with reading one of the fellow courts of appeal, the language from a fellow court of appeal to you. It's appropriate if that's the law that applies. And I think it's important language. This is from LH Controls Inc. v. Custom Conveyor. It's 974 Northeast 2nd, 1031 at 1042. Quote, It is axiomatic that a party injured by a breach of contract may recover the benefit of its bargain, but is limited in its recovery to the loss actually suffered. A party injured by a breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred. A damage award must be based upon some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct interference from known circumstances. The damages claimed must also be the natural, foreseeable, and proximate causes of the breach. Fundamentally here, Your Honors, the question is what is the loss actually suffered? That is the determination that was not made below, and that is the determination we are asking be made on remand. If the Court has further questions? Thank you. And that is why you are asking that it be sent back on the issue of damages. That is correct, Your Honor. Thank you. You guys did a great job. You actually made this interesting, which at first blush, I have to say, I at least was not so sure it would be. So you did a very good job of your briefs and your arguments, and you will hear from me shortly.